OPINION
{¶ 1} Mother-appellant, Teresa Ridenour (hereinafter "Teresa"), appeals the Allen County Court of Common Pleas, Juvenile Division, judgment granting permanent custody of her three children to the Allen County Children Services Board (hereinafter "ACCSB"). For the reasons that follow, we affirm. *Page 3 
 {¶ 2} Teresa Ridenour is the biological mother of three children: April (DOB April 3, 2002), Roy, Jr. (DOB January 8, 2004), and Victor (DOB March 21, 2005), (collectively referred to as the "children").[1]
The record reveals that Roy, Jr. has gastro esophageal reflux disease, which has required the use of a feeding tube.
 {¶ 3} On April 25, 2005, the ACCSB filed a complaint with the trial court. The complaint listed the following issues: 1.) the fact that Roy, Jr. had a feeding tube and the agency was concerned with the care and follow up Roy, Jr. received; and 2.) concerns for the safety of the children in relation to Roy Nichols, Sr. who had several instances where he was involved in offenses against children. Thereafter, the children were placed in shelter care.
 {¶ 4} On July 21, 2005, the magistrate entered findings of fact, found the children to be dependent, and placed the children in the temporary custody of the ACCSB. On August 3, 2005, the trial court adopted the magistrate's decision, which adjudicated the children as dependent children, and placed the children in the temporary custody of the ACCSB.
 {¶ 5} The ACCSB filed a motion for permanent custody of the children on May 4, 2006. The trial court held hearings on October 18 and December 13, 2006. *Page 4 
The children's guardian ad litem filed a report and recommendation on December 19, 2006, recommending that the ACCSB's motion for permanent custody be granted. The trial court subsequently granted permanent custody of the three children to the ACCSB.
 {¶ 6} It is from this grant of permanent custody that Teresa appeals and asserts a single assignment of error for our review.
 ASSIGNMENT OF ERROR The trial court's award of permanent custody of April, Roy, Jr., and Victor to Allen County Children's Services Board ("ACCSB") because the children could not be placed with their mother within a reasonable period of time was not supported by clear and convincing evidence.
 {¶ 7} In her sole assignment of error, Teresa argues that the trial court based its determination that the children could not be returned to their mother within a reasonable time period on R.C. 2151.414(E)(1), (E)(2), (E)(4), and (E)(16), but there was not clear and convincing evidence to support each section. Teresa concedes that her intellectual abilities are not sufficient to care for Roy, Jr., who has special medical needs, but argues that she is capable of caring for at least one of her children as demonstrated by her ability to raise April for two years before Roy, Jr. and Victor arrived.
 {¶ 8} "[T]he right to raise a child is an `essential' and `basic' civil right." In re Hayes (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing In re Murray *Page 5 
(1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169, quoting Stanley v.Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. "[P]arents have a fundamental liberty interest in the care, custody and management of their children." In re Schaeffer Children (1993),85 Ohio App.3d 683, 689, 621 N.E.2d 426, citing Santosky v. Kramer (1982),455 U.S. 745, 753, 102 S.Ct. 1388, 102 S.Ct. 1388.
 {¶ 9} A court may grant permanent custody of a child under R.C.2151.414(B)(1) if the court determines "by clear and convincing evidence that it is in the best interest of the child" and one of the four factors listed in R.C. 2151.414(B)(1)(a)-(d) applies. R.C.2151.414(B)(1)(a) states, "The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."
 {¶ 10} R.C. 2151.414(E) provides in pertinent part:
 In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determined, by clear and convincing evidence at a hearing* * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: *Page 6 
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially cause the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 (2) Chronic mental illness, chronic emotional illness, mental retardations, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
 (16) Any other factor the court considers relevant.
Emphasis added.
 {¶ 11} Clear and convincing evidence is defined as:
 that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such *Page 7 certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
In re Smith, 3d Dist. No. 9-04-35, 2005-Ohio-149, ¶ 36, quotingCross v. Ledford (1954), 161 Ohio St. 469, 477, 120 N.E.2d 118, citations omitted.
 {¶ 12} The trial court found that the grant of permanent custody to the ACCSB was in the best interest of the children. The trial court also found R.C. 2151.414(E)(1), (E)(2), (E)(4), and (E)(16) applied to Teresa and the children could not be returned to either parent within a reasonable time or should not be placed with either parent.
 {¶ 13} In this case, Teresa is not disputing the trial court's determination that permanent custody is in the best interest of the children. Instead, Teresa is arguing that there is not clear and convincing evidence that the children could not be placed with her in a reasonable period of time.
 {¶ 14} Regarding the trial court's findings under R.C. 2151.414(E)(1) and (E)(4), Teresa argues the state conceded that she attempted to complete all the "hoops" that they put in front of her and the original caseworker said she attended visitation "religiously." In addition, Teresa points out that she has maintained employment throughout most of the ACCSB's involvement, and that she testified that she was willing to keep the payee, attend psychiatric counseling, would discuss her past, and would take her medication. *Page 8 
 {¶ 15} Latasha Macklin, a caseworker, testified that Teresa had tried to complete all the "hoops" placed in front of her by the agency. (T. 10/18/06 at 166). Brent Burke, Teresa's caseworker from August 2005 until January 2006, testified that she attended her visitations "religiously." (T. 10/18/06 at 74, 94). However, Burke also testified that Teresa's visitations with the children were "pure chaos." (Id. at 80). In addition, Burke testified that Teresa would interrupt the children's therapy, and the therapists "had stopped a few therapy appointments and asked me, `Can we do this without mother?'". (Id. at 79).
 {¶ 16} While Burke testified that Teresa attended her visitations "religiously", Tammy Holly testified that Teresa made about half of her visitations from March to July, and Latasha Macklin testified that Teresa made about half of her visitations since February. (T. 10/18/06 at 146; 158). Further, Holly testified:
 Q. Did [Teresa] ever manifest her frustration in other ways other than asking you to help out?
 A. Every time she would maybe yell and call them a brat or spoiled. "I know what's wrong with you. You're just spoiled", and yell and things of that nature. Victor never took notice to it, but I think on two occasions April became upset and cried when she said brat.
(Id. at 147).
 {¶ 17} At the hearings, Teresa testified: she had a payee taking care of the bills; she maintained her house for over a year; she would go to counseling; and she would take medication. (T. 12/13/06 at 53, 54, 59-60). *Page 9 
 {¶ 18} The record contains evidence that Teresa has a payee taking care of her bills and that she had maintained her current house for over a year. The record, however, also contains evidence contrary to Teresa's assertions including evidence that Teresa was resistant to counseling and reluctant to take any medications. For instance, Burke testified that Teresa had attended counseling at Covenant Ministries, however, it was a faith based counseling and the therapists did not "feel it was going to prosper her any. They kind of stopped that." (T. 10/18/06 at 81). According to Burke, no more counseling referrals were made because when he talked to Teresa about it, "she didn't feel it was necessary. She didn't feel comfortable talking to them about her life and her problems." (Id. at 89). In addition, Latasha Macklin testified about Teresa's reluctance to take medication stating:
 Q. We have also talked a couple times about possibly getting her some help with taking some medication for her depression. You know about that. Correct?
 A. Yes.
 Q. Did you ever have, once again, a frank discussion with her about our belief that she should be taking some medication to help her out?
 A. Yes.
 Q. What did she tell you about that?
 A. I explained to her . . . there was an occasion that I was at Teresa's home. We were discussing Dr. Patrick's assessment, and she asked me to explain to her what it said about her children. So I read to her the suggestions that Dr. Patrick made, and one of those was possible anti-depression or some type of medication, and she said to me, "I will not take medication. My mother tried to kill me with medication". *Page 10 
 Q. Do you know that to be true or not to be true?
 A. I do not know.
 Q. Have you had the same type of conversation with Teresa regarding intensive or on-going counseling or talking to someone about things going on in her life.
 A. Yes.
 Q. What was her response to you about that?
 A. She said she does not want to talk to anyone about her problems.
 Q. Did you ask her why?
 A. Yes.
 Q. What did she tell you?
 A. She said that she doesn't feel comfortable.
 Q. Comfortable with talking to someone?
 A. Correct.
(Id. at 161-62.)
 {¶ 19} After reviewing the record, we find there is clear and convincing evidence to support the trial court's findings that R.C.2151.414(E)(1) and (E)(4) apply in this case.
 {¶ 20} The trial court also found under R.C. 2151.414(E)(2) that Teresa's "chronic mental retardation is so severe that it makes her unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the date of this hearing."[2]
 {¶ 21} Regarding the trial court's findings under R.C. 2151.414(E)(2), Teresa argues, although there is much discussion about her inability to parent her children due to her intellectual functioning, all the witnesses testified that she *Page 11 
acted appropriately with her children. Further, Teresa argues that although the state's expert says that Teresa is incapable of acknowledging a problem, Teresa sought help from the ACCSB in the first place. Teresa concedes that her intellectual abilities are not sufficient to take care of Roy, Jr. due to his special needs, but argues that she is capable of caring for at least one of the children.
 {¶ 22} Both Dr. Thomas Hustak and Dr. Carol Patrick testified regarding Teresa's level of functioning. (See T. 10/18/06 at 19-20; T. 12/13/06 at 34). Dr. Hustak testified that Teresa received a full scale IQ score of 65, that the score "falls into an area that is known as mild mental retardation", and people with that level of mental retardation function at a fifth or sixth grade level. (T. 10/18/06 at 19-20). According to Dr. Hustak, Teresa's level of functioning is going to remain the same. (Id. at 44).
 {¶ 23} In addition, Dr. Hustak testified that Teresa "tends to be highly suspicious" and that "testing suggested that she had paranoid traits, she had avoidant traits, that she had schizoid features". (T. 10/18/06 at 26, 36).[3] According to Dr. Hustak, Teresa has what is "referred to in the literature as magical thinking. Some people just simply have magical ideas about how things will be solved in their life. At times their thinking is not very stable." (Id. at 27).
 {¶ 24} Dr. Hustak testified: *Page 12 
 * * * Number one, that she has a short fuse and tends to be impulsive. The next one is that she has limited intellectual understanding. The next one is that she does have problems with moodiness and agitation. Part of that is related to the depression. Part of that is related to the mild mental retardations. Part of that is related to the personality traits that she has. I thought that the risk that appeared in this case was primarily a combination of impulsiveness, getting angrily quickly, not having the kind of support that she would need, and then perhaps losing control of her temper; or perhaps, because she doesn't have much insight, perhaps runs the risk of neglecting the children when they need her. Denial is a wonderful thing. If you don't see that there is a problem, it's impossible to fix it if you can't acknowledge that there is a problem. The observation that ran through my evaluation consistently was that I think Teresa feels in her heart that she loves her children. * * * I think she wants to do well by them. On the other hand, my responsibility to Children's Services and to the Court is to offer the honest assessment to say that it would be a Herculean task at best for Teresa to be able to manage all of those items that she is going to encounter because of the personality, intellectual, and other limitations she has. * * *
(T. 10/18/06 at 49).
 {¶ 25} During cross-examination, Dr. Hustak testified to the following regarding risks to the children:
 Q.* * * according to your report * * * I believe that one of your conclusions was that you placed Teresa into a category of moderate risk for being able to adequately protect her children. As of today's hearing, if there was evidence to say that she has now a payee-ship in place that is handling her money, that she has a three bedroom apartment, that she is working her job, that the relationship between her and Ray[sic] . . . because he is in jail, certainly there is no physical contact between them; and if she was going to a counselor and seeing a counselor and taking depression medicine, wouldn't that fact decrease the risk to her children? *Page 13 
 A. Yes, if she had all of those support features in place.
 Q. Isn't it also true that it would decrease the risk if she also had someone . . . a professional, a social worker that was in helping her on a regular basis?
 A. Yes.
 * * *
 Q. Would you have an opinion as to what that risk would then be lowered to?
 A. I wouldn't have an opinion until I would have to reevaluate her to make certain that she was consistent in following through . . . that everything was in place. That all of those protection mechanisms were, in fact, solid in her life. Q. Then that would decrease the risk to a minimal risk, in your opinion, if those things were in place?
 A. No. It would decrease the risk, but not to the minimal because of her personality traits and her intellectual functioning. It would decrease the risk in the sense that there would be a safety net built in to her life if she had all of those things in place and she was surrounded by several people who would provide for safety and protection. Q. But she would still be at moderate risk? A. Yes.
 Q. And the moderate risk is based upon what, then? A. Her intellectual functioning which always places her there, and it is what it is as I've testified, and her personality traits that be definition are characterlogical traits that are probably not going to change over time.
 * * *
(T. 10/18/06 at 65-66).
 {¶ 26} Dr. Carol Patrick also testified that Teresa has magical thinking and depressive disorder not otherwise specified. (T. 12/13/06 at 31). According to Dr. Patrick, regarding Teresa's ability to care for her children, there is no indication that there would be any risk of sexual abuse, and not much of an indication of physical abuse. (Id. at 35). Dr. Patrick, stated that Teresa is "a concrete thinker *Page 14 
and she has some poor coping skills, so those combinations with anybody can certainly indicate some possibility of overly harsh punishment if they become angry or upset with a child." (Id. at 35-36). Dr. Patrick further testified that there is more difficulty with neglect or dependency issues "just in her ability to manage . . . keeping an apartment, keeping food, keeping the kids clothes, getting them to appointments, managing money, those kinds of things without support." (Id. at 36).
 {¶ 27} Dr. Patrick testified, "I think if she had the mental health and psychiatric support and had support from an advocate maybe who could help her in a lot of different areas so she didn't have four different people helping in four different areas . . . if that could be obtained, that she could probably care for April." (Id. at 37). At the hearing, Dr. Patrick testified:
 Q. What about Teresa caring for all three children?
 A. I think that would be difficult. As much as I think because of the developmental disabilities, the amount of therapy and appointments they need, certainly Roy, Jr., current or recent medical needs are difficult to handle; but whether or not Victor is going to need significant care or more significant care than April, at this point, I'm not sure that that can be determined. I think it's possible that she may be able to care for both of those. I don't know about Roy. Jr., as far as the medical needs in the future that he might have.
 Q. In your professional opinion, do you believe that Teresa's mental retardation is to a point where it's so severe that she cannot provide an adequate permanent home for the child? Let's specifically talk about April at the present or within one year, if she receives some of this counseling? *Page 15 
 A. I think if she receives some of the counseling and support . . . that she probably would be able to provide an adequate home for April.
 Q. What about in response to Victor?
 A. Within a year, I don't know. I would want to see her doing it with April for awhile first.
 Q. So you would kind of expect a phase in approach to start seeing how April would work?
 A. Yes.
 Q. Okay. Certainly with Roy, Jr., having his medical problems, that would make that much more difficult?
 A. Yes.
(T. 12/13/06 at 38-39).
 {¶ 28} Even though there is evidence that Teresa initially sought help from the ACCSB, and several witnesses testified that Teresa behaved appropriately towards her children, there was evidence in the record regarding Teresa's "mild mental retardation" which affects Teresa's ability to provide a permanent home. As previously noted, Dr. Hustak testified that it would be a "Herculean task at best for Teresa to be able to manage all of those items that she is going to encounter because of the personality, intellectual, and other limitations she has". (T. 10/18/06 at 49). From the evidence in the record it is also clear that Teresa's level of intellectual function is not going to improve. (Id. at 44).
 {¶ 29} Accordingly, we find the record contains competent credible evidence to support the trial court's conclusion that Teresa's mental retardation is so severe and prevents Teresa from providing an adequate permanent home at the present time and as anticipated within one year. *Page 16 
 {¶ 30} Finally, the trial court found under R.C. 2151.414(E)(16), "the mother because of her low intellectual abilities and unwillingness to recognize that the alleged father was guilty of the sex offenses involving minors, including sex offenses involving his sisters and a niece, cannot provide protection for her three children from substantial potential of sex abuse by the alleged father."
 {¶ 31} Teresa argues that although the "father's propensity to abuse children is disconcerting", it must be noted that the father is incarcerated for the next three years. Teresa also argues that there were no allegations presented that the father had abused his children.
 {¶ 32} At the October 18, 2006 hearing, Roy Nichols, Sr. testified that he was incarcerated for pandering sexually oriented material. (T. 10/18/06 at 186). As of that date, Nichols had entered a plea negotiation on the record, but he had not yet been sentenced. (Id. at 187). Nichols testified:
 Q. As part of a plea negotiation, most certainly somebody filled you in on the possible potential maximum sentence that you could get. Correct?
 A. The plea agreement which I have already signed onto which has already been agreed upon by the Court and by the prosecution, five years total aggregate.
(Id. 187-188).
 {¶ 33} Latasha Macklin testified that there was no history that Nichols abused his and Teresa's children. (Id. at 157). There was testimony indicating *Page 17 
that Teresa made conflicting statements about whether she was going to be involved with Nichols after he was released. According to Dr. Hustak,
 Teresa stated that she was engaged to a Mr. Nichols* * * I did not evaluate Mr. Nichols directly. She stated to me that he was in jail for some type of a charge related to maintaining child pornography. She told me on one hand that she wasn't going to see him, and then on the other hand she told me she was going to maintain a relationship with him when he got out of jail. When I pointed out to her that that sounded contradictory . . . how can you provide safety for the children if you're going to maintain a relationship with somebody with those charges, she became a little bit defensive, a little bit angry with me. I decided not to push the issue because I already had my answer to the question; but I thought very honestly that that clearly would raise a risk to children if you're providing for protection of children. Your concern and love for somebody has to be put on hold if you're going to provide for protection of children.
(Id. at 50).
 {¶ 34} Even though Nichols is currently incarcerated and there were no allegations that Nichols had abused his and Teresa's own children, the record clearly supports the trial court's finding that Teresa would not protect the children from potential sex abuse. Teresa has continually changed her mind about whether she would be involved with Nichols upon his release from prison.
 {¶ 35} The issue in this case, is not just Nichols, who may be in prison for three more years, but also Teresa's inability or unwillingness to place her children's needs first and protect her children in this type of situation from individuals like Nichols. *Page 18 
 {¶ 36} After reviewing the record, we find that there is clear and convincing evidence to support the trial court's findings that the children cannot be returned to Teresa within a reasonable period of time or should not be returned to her. Consequently, we overrule Teresa's sole assignment of error.
 {¶ 37} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgments of the trial court.
Judgments Affirmed.
 SHAW, J., concurs.
[1] The trial court indicates that Roy Nichols, Sr. is the alleged father of the children. However, paternity testing determined that Roy Nichols, Sr. is not the biological father of April and the identity of April's biological father is unknown. Roy Nichols, Sr. is not a party to this present appeal, and he will be referred to only when relevant to Teresa's appeal.
[2] We note that this quote was taken from the judgment entry filed in April's case; however, the judgment entries in Victor and Roy, Jr.'s cases include the same findings.
[3] According to Dr. Hustak's testimony, schizoid and schizophrenia are different. (T. 10/18/06 at 36).